UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 14-37-GFVT |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION** |
| V. | ) | **&** |
| | ) | **ORDER** |
| JAMES ALVIN CHANEY, LESA L. | ) | |
| CHANEY, and ACE CLINIQUE OF | ) | |
| MEDICINE, LLC, | ) | |
| | | |
| Defendants. | | |

*** *** *** ***

After an exhaustive trial that spanned almost two months, a jury found Dr. James Alvin Chaney and his wife, Lesa L. Chaney, guilty of drug trafficking, health care fraud, making false statements and money laundering. [R. 281.] The Chaneys later moved for a judgment of acquittal and new trial on all counts. [R. 296, 297, 298, and 299.] The Court will now DENY both of Dr. Chaney's motions, DENY Mrs. Chaney's Motion for Acquittal, and GRANT IN PART her Motion for New Trial.

**I**

The Chaneys' story is a familiar one in this District. In 2006, the couple opened Ace Clinique of Medicine, LLC ("the Clinique"), a primary care clinic in Hazard, Kentucky. [R. 190 at 11.] The Clinique rapidly became a popular and lucrative enterprise. But according to the United States—and, more importantly, according to a jury—this success came at a high cost. In a 256-count indictment returned in December 2015, the Government accused the Chaneys of operating a taxpayer-funded pill mill. [R. 311 at 1.] At trial, the prosecution presented evidence

that the Chaneys knowingly left pre-signed prescriptions at the Clinique for distribution by unlicensed and unqualified medical staff, altered urine drug screens to conceal patients' drug abuse and/or diversion, triple- and quadruple-booked patients in the same time slot, forced others to wait for up to eight hours to be seen, fabricated medical records, and submitted fraudulent billings to public and private insurance providers. [*Id.*]

In April 2016, a jury convicted Dr. Chaney of sixty-one counts of unlawfully dispensing and distributing controlled substances, two counts of maintaining a drug-involved premises, two counts of knowingly obtaining controlled substances through misrepresentation or fraud, sixty-five counts of health care fraud, twenty counts of making false statements related to health care matters, twenty-one counts of money laundering, and three counts of conspiracy.[1] [R. 281 at 1-31.] The jury also convicted Mrs. Chaney of two counts of maintaining a drug-involved premises, thirteen counts of health care fraud, twenty counts of making false statements related to health care matters, twenty-one counts of money laundering, and three counts of conspiracy. [*Id.*]

The Chaneys then filed the present motions for acquittal and a new trial. [R. 296, 297, 298, and 299.] Both Defendants resuscitate the claim, previously rejected at trial, that the Government failed to produce sufficient evidence to support their convictions. [R. 296, 297.] They also seek a new trial on the basis of alleged (1) juror misconduct involving premature deliberations and (2)

---

[1]  The jury also convicted a corporate Defendant, Ace Clinique of Medicine, LLC, of identical counts, with two exceptions: only Dr. Chaney was convicted of knowingly obtaining controlled substances through misrepresentation or fraud (Counts 66 and 67), and only the Clinique was convicted of making false statements related to the pre-signed certificates of medical necessity scheme (Counts 221-233). [R. 281 at 9-10, 26-28.] For the sake of clarity and efficiency, the Court will only refer to the individual Defendants in the body of this order.

prosecutorial misconduct in the Government's closing argument.[2]  The Court will address each of these claims in turn.

## II

## A

To begin, the Court finds no cause to disturb its previous order denying the Chaneys' motions for acquittal.  [R. 267.]  Under Fed. R. Crim. P. 29(c), courts may "reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). Substantial evidence is "more than a scintilla," but need only be enough "evidence as a reasonable mind might accept to support a conclusion."  *Id.*  The Court will thus uphold a jury verdict "if, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).   When measuring the sufficiency of the Government's case, the Court must "decline to weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury." *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992).  Combined, "[t]hese standards place a very heavy burden upon a defendant making a sufficiency of the evidence challenge."  *Id.*  (internal quotations and citation omitted).

In its previous order, the Court thoroughly detailed the evidentiary basis for the charges against the Chaneys.  [R. 267.]  The Court now incorporates by reference those factual and legal

---

[2]  Dr. Chaney also attempts to renew his motion to suppress certain patient files seized during a raid of the Clinique in September 2013.  [R. 299-1 at 7.]  This is the third time he has moved to suppress these files. [R. 71, R. 261, R. 299-1.]  He provides no new grounds for this motion, and merely restates the same arguments that the Court rejected in two previous orders.  The Court incorporates by reference the factual and legal conclusions contained in those orders.  [R. 159, R. 273.]  It is far too late to re-litigate this claim here.

conclusions, and adds a few points in response to the Chaneys' renewed motions for acquittal. First, the Court remains unpersuaded by the Chaneys' declaration that "no evidence" indicated the pre-signed prescriptions supplied by Dr. Chaney "were not medically necessary for any patient."[3] [R. 327 at 2.] This claim begins with a flawed premise and works backward. The Chaneys ask the Court to presume that the legitimacy of a prescription will always depend on the medical condition of that prescription's ultimate recipient. And if, luckily, this recipient has a condition that might otherwise justify her use of the pills—or, alternatively, if no expert testimony proves that she lacked such a condition—a reasonable jury could not find the prescriber guilty of violating the Controlled Substances Act. [*Id.* at 2-3, R. 296-1 at 5-7.]

This interpretation of the relevant legal standard contradicts both the case law and common sense. Accepting the Chaneys' premise, no physician could be held criminally liable for distributing opioid prescriptions to users who incidentally carried some legitimate need for painkillers, regardless of where, why, or how those prescriptions were issued. Suppose, for example, that a physician began dispensing prescriptions for powerful narcotics to strangers on a street corner, without asking for their medical history or performing a medical examination of any kind. Under the Chaneys' proposed construction of the law, the Government could not prosecute this physician for dispensing painkillers "without a legitimate medical purpose"[4] absent some expert testimony that proved each stranger did not have a legitimate need for the pills. That cannot

---

[3] Although the indictment did not charge Mrs. Chaney with individual counts of unlawful distribution, the jury did convict her of conspiracy to violate the Controlled Substances Act. In her motion for acquittal, Mrs. Chaney relies on a similar argument to support her challenge to the conspiracy conviction, claiming the Government needed to prove that a "representative sample" of patients received these prescriptions without a legitimate medical purpose. [R. 296-1 at 5-7.] The Court rejects this argument for the same reasons explained below.

[4] The two federal statutes implicated here—21 U.S.C. § 846 and 21 U.S.C. § 841(a)(l)—each turn on the question of whether Dr. Chaney issued these prescriptions "without a legitimate medical purpose." *See, e.g., United States v. Volkman*, 797 F.3d 377, 384-387 (6th Cir. 2015).

be the rule. The circumstances surrounding the provision of a prescription must be relevant to—and sometimes dispositive of—the question of that prescription's legitimacy.

Contrary to Mrs. Chaney's insistence, this logic is entirely consistent with the Sixth Circuit's recent holding in *United States v. Arny*, 2016 WL 4073491, at *7 (6th Cir. Aug. 1, 2016). In *Arny*, the Government accused the defendant of, among other things, refilling opioid prescriptions for certain patients without seeing them face-to-face. *Id.* The defendant responded that "half the patients" he saw were "unstable" and "had poor pain control," while the other "half were very stable." *United States v. Stephen C. Arny*, 7:12-CR-00011-ART, DE 306 at 108. Because he "felt rushed" and "there wasn't time" to examine every patient, he began refilling prescriptions for some patients without physically seeing them. *Id.* But the defendant also testified that he was present at the office when he refilled these prescriptions, and that he "read every file and every chart that was brought to [him] on each and every patient" before issuing a script. *Id.* at 160. On cross-examination, another staff member conceded that the defendant "reviewed [those charts] before he wrote the prescriptions." *Id.* at 79-80.

The *Arny* court found that the defendant's trial counsel provided ineffective assistance by failing to call numerous potentially helpful witnesses. *Arny*, 2016 WL 4073491 at *6. In particular, the court faulted counsel for not calling a physician who had previously worked at the facility. The court anticipated that this physician's "testimony that she, as a practicing pain management specialist, had prescribed the same 'near toxic' combination [of pills] that [the government's expert witness] described . . . [might] have demonstrated that there was a legitimate medical purpose for prescribing that combination of medication." *Id.* The court did acknowledge that the specialist's "testimony that she always saw every patient on their return visits, whereas

5

[the defendant] would sometimes refill prescriptions for his patients without seeing them in person, [might] not have helped [his] defense." *Id.* But the court also noted that "the expert witnesses for both the defense and the government stated that the applicable regulations did not require [the defendant] to see every patient on every visit," and that in any case "[the specialist's] testimony on that point would have been cumulative and not necessarily harmful to [him]." *Id.*

Mrs. Chaney now argues that "[t]he dissonance between the testimony of the government's expert medical witness . . . in *Arny* and the arguments it presented in this case illustrate the absence of evidence to support the verdicts."[5]  [R. 362-1 at 4.]  There are numerous problems with this claim.  Most evidently, Mrs. Chaney unreasonably conflates the conduct at issue in *Arny*—which involved a defendant who refilled prescriptions without a face-to-face examination, but was otherwise present at the clinic and reviewed each patient's charts before signing the scripts—with Dr. Chaney's practice of pre-signing prescriptions.  The defendant's practice in *Arny*, for example, would not have violated the federal regulation prohibiting pre-signed prescriptions, which simply requires that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued." 21 C.F.R. § 1306.05(a).

By contrast, Dr. Chaney never argued that he was present at the office when patients received these pre-signed scripts, nor did he claim that he reviewed any patients' charts before

---

[5]  Mrs. Chaney extensively cites the testimony of an expert witness in Dr. Arny's trial.  [R. 362-1 at 1-4.]  Most of this testimony is not taken from the Sixth Circuit's opinion; instead, she has directly lifted this testimony from the trial record in that case.  Mrs. Chaney may wish that this expert had testified at her trial, but he did not.  The *Arny* court's legal conclusions are relevant to this Court's discussion, but the cited expert testimony—provided in a different trial, against a different defendant, and on a different set of facts—is not before the Court.  Regardless, this witness stated only that "there are no absolute rules with regards to common sense" in prescribing opioids, and that he would not "argue with" a physician issuing "a single prescription one time for a patient without seeing them because he's had a death in the family."  *United States v. Stephen C. Arny*, 7:12-CR-00011-ART, DE 362 at 20.  This testimony plainly failed to account for Dr. Chaney's practice of signing hundreds of pre-signed prescriptions days or weeks in advance, without any notice of who would ultimately receive those prescriptions.

6

signing the blank pads. Instead, the evidence demonstrated that Dr. Chaney signed hundreds of blank prescriptions days or weeks in advance, without any foreknowledge of who would ultimately receive those prescriptions. [R. 321 at 18-23.] Mrs. Chaney would then leave "stacks" of these pre-signed scripts in a drawer for Roy Combs, the office's untrained "IT guy," who would hand them out for distribution by unlicensed and unqualified medical staff. [*Id.* at 10, 18-23.] The Chaneys' illegal behavior is easily distinguishable from the misconduct addressed in *Arny*, and the *Arny* court's discussion is only tangentially relevant to this dispute.

Just as importantly, the *Arny* court never held that the defendant's failure to conduct face-to-face examinations was irrelevant to the charges against him. In fact, the court expressly recognized that the pain management specialist's "testimony that she always saw every patient on their return visits, whereas [the defendant] would sometimes refill prescriptions for his patients without seeing them in person, [might] not have helped [his] defense." *Arny*, 2016 WL 4073491 at *6. The court merely acknowledged that the defendant's failure to examine some patients in person, standing alone, was not enough to convict him. The Chaneys made a similar claim at trial when they argued "that [21 C.F.R. § 1306.05(a), which prohibits pre-signing prescriptions] does not create strict liability for a criminal violation of 21 U.S.C. § 841(a)." [R. 242 at 11-12.] This Court agreed and struck references to § 1306.05(a) from the jury instructions. [R. 272.] At best, then, *Arny* simply reinforces what the Court already held: Although Dr. Chaney's practice of pre-signing prescriptions was not *per se* criminal, the jury was entitled to consider evidence of this practice as relevant to the charges against him.[6]

---

[6] The Government did not charge Mrs. Chaney with individual counts of pre-signing prescriptions. The jury did convict her of participating in the drug conspiracy, but that count did not rely solely on Dr. Chaney's habit of pre-signing prescriptions. Even if *Arny* were relevant to the pre-signed prescription counts, it would not substantially undermine any of the other evidence relevant to her conspiracy conviction. *See infra* at 43-47.

The other two cases cited by the Chaneys only reinforce this conclusion. In *United States v. Binder*, 26 F. Supp. 3d 656 (E.D. Mich. 2014), the court held that "expert testimony is not always required" to support a drug distribution charge against a physician, "particularly in cases where there is evidence of conduct clearly outside the usual course of any professional practice." *Id.* at 662. In its survey of situations that are so "clearly outside" any usual course of practice, the court cited circumstances where a physician prescribed opioids without "conducting any examination, and in some cases without even meeting patients." *Id.* And in *United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013), the court held that, "[a]lthough . . . a violation of [§ 1306.05(a)] does not constitute a *per se* violation of [the Controlled Substances Act], the jury was entitled to infer, based on [the physician's] pre-signing and pre-dating of the prescriptions and [an unqualified physician's assistant's] delivery of those prescriptions to . . . patients, that they violated the Act." *Id.* at 1102. The court then cited an expert's testimony that "a reasonable doctor and physician's assistant would know that it is unlawful to distribute pre-signed prescriptions," and held that "a physician's delivery of a prescription without conducting any physical examination of the patient provides *strong evidence* to support a conviction under the Act." *Id.* (emphasis added).

Similarly here, the Government presented ample evidence to support the unlawful distribution counts.[7] Dr. Chaney admitted to pre-signing prescriptions that were later distributed by unqualified staff, often while he and Mrs. Chaney were on vacation. [R. 318 at 114-15.] Gregory Hoskins, a physician's assistant, and Shannon Wilder, a nurse practitioner, habitually issued these pre-signed prescriptions, despite the fact that neither were licensed to prescribe

---

[7] The Chaneys also argue that the evidence did not support their convictions for making false statements related to the pre-signed prescriptions scheme. [R. 298-1 at 12, R. 296-1 at 10-11.] This claim fails for similar reasons, and the Court will reject this argument by citing (1) the analysis above, (2) its treatment of this argument in a previous order, and (3) the discussion of these counts in relation to Mrs. Chaney's motion for new trial. *See* R. 267 at 11, *infra* at 47-49.

controlled substances.  [*Id.* at 115.]  Combs also testified that Dr. Chaney instructed him "not to tell anyone" about the pre-signed scripts.  [R. 321 at 19.]  And all of this behavior occurred in the context of the Clinique's other disturbing and illegitimate practices, as evidenced by testimony that the Chaneys altered urine drug screens to conceal evidence of patients' drug abuse and/or diversion, quadruple-booked patients into fifteen-minute time slots, forced others to wait for up to eight hours to be seen, and fabricated patient charts.  [R. 340 at 9, 339 at 7; R. 335 at 10-11, R. 344 at 19, R. 336 at 5, R. 293 at 51-52, R. 321 at 101.]; *see also infra* at 37-38, 43-47.

Numerous witnesses also testified that pre-signed prescriptions were illegitimate.  Dr. Morgan stated it "was pounded into [doctor's] heads during residency" that they should not pre-sign prescriptions, and "it was something that was so engrained, that it didn't really need to be almost taught."  [Tr: Morgan Direct Examination at 5.]  Dr. Youlio testified that a "pre-signed but otherwise blank prescription" could not be issued "for a legitimate medical purpose," and that Medicare and Medicaid would not pay for such a prescription because it was "not for a medically accepted purpose."  [TR: Youlio Direct Examination at 7.]  Dr. Loyd likewise confirmed that "you can't have pre-signed prescriptions," and that issuing these prescriptions was not "acceptable medical practice."  [TR: Loyd Direct Examination at 110, 117-18.]  Against the backdrop of this evidence, a jury could reasonably infer that the prescriptions at issue here—signed on a blank notepad, provided with total ignorance of their ultimate recipients, and later distributed by unlicensed and unqualified medical personnel—were supplied "outside the usual course of professional practice and not for a legitimate medical purpose."  [R. 272 at 25.]

Second, the Chaneys challenge their convictions for submitting fraudulent billings in connection with unnecessary urine drug screens.  [R. 298-1 at 9, R. 296-1 at 7.]  At trial, Dr. Frank

Parker testified that the Kentucky Board of Medical Licensure recommends requiring "a urine drug screen once a year" if a patient is at "low risk" for opioid abuse, twice a year "if they're at moderate risk," and "three to four times a year if they're considered to be high risk." [R. 244 at 75.] He then carefully summarized the "tables that [he] performed for each [relevant] patient" to "document their Opioid Risk Tool and [count] how many urine drug screens they had per month." [Id. at 81.] He concluded that "all these patients were low risk for abuse of their medicines," and so the appropriate frequency of their urine drug screens should have been "one a year," for a total of thirty-one tests.[8] [Id. At 86.] The Clinique nevertheless billed for 311 urine drug screens during this time period. [Id.] The Government also introduced evidence that the Clinique was the number one biller in the state for urine drugs screens during this period, accounting "for an astounding ten percent of all urine drug screens billed in the Commonwealth of Kentucky." [R. 310 at 10.] Martha Smith recalled that the Clinique "probably did anywhere from 80 to 100 drug screens a day." [R. 341 at 6.] And Hoskins testified that all patients received urine drug screens "monthly," that these tests were not always necessary, and that he "felt like [the tests were] too frequent." [R. 293 at 56.]

Dr. Chaney also concedes that "Dr. Berman and Ms. Guice each testified that 'absent a medical indication,' Medicaid and Medicare would not pay for routine drug screens." [R. 298-1 at 9.] He argues, however, that this testimony simply "begs the question," because "there was

---

[8] Dr. Chaney briefly claims that the Court should afford little or no weight to Dr. Parker's testimony because it was "not based on his own experience, but on a guidance document found on the Kentucky Board of Medical Licensure website." [R. 298-1 at 9.] Professional standards in Dr. Chaney's region of practice are certainly relevant to the question of whether these tests were medically indicated. More importantly, Dr. Parker did not simply recite the language of this guidance document; instead, he applied the principles outlined in the document to the unique records associated with Dr. Chaney's patients. This application required a fusion of the written professional standards and Dr. Parker's personal expertise. That is not uncommon in expert testimony.

nothing but Dr. Parker's testimony to indicate the absence of a medical indication." [*Id.*] But the Government's case rested precisely on the claim that, by habitually ordering monthly tests without regard for a patient's risk of opioid abuse, the Chaneys failed even to consider whether the tests were medically indicated. Hoskins, for example, indicated there was a "standing order" to perform urine drug screens on patients, and "when [he] got to the chart, [the order for a test] would already be on the chart. When the patient got to the room, it would already be [there]." [R. 293 at 55.] Mrs. Chaney counters that there is an "ongoing debate" about the propriety of ordering these routine tests, and suggests that Dr. Loyd "lauded" the Chaney's "monthly regime." [R. 296-1 at 8.] But even Dr. Loyd faulted the Chaneys for performing these tests "[e]very single time" a patient visited, and argued instead that "you need to be doing random urine drug screens." [TR: Loyd Direct Examination at 23.] And it is not the role of the Court to balance Dr. Loyd's testimony against that of Dr. Parker, Dr. Berman and Ms. Guice. On these facts, a "rational trier of fact" could have "found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319.

Third, Dr. Chaney asks the Court to revisit his claim that "there was no testimony tying the counts of the indictment [related to fraudulent hospital billings] to dates on which Dr. Chaney was out of town." [9] [R. 298-1 at 10.] The jury convicted Dr. Chaney of billing for hospital services supposedly rendered by him—which generated a higher reimbursement rate than services

---

[9] Dr. Chaney relatedly argues that "the jury's verdict, finding Defendants not guilty as to some [of the hospital billing] counts and guilty as to others, is inconsistent." [R. 298-1 at 11.] He also emphasizes that the Government did not "respond to [his] argument regarding the inconsistency in the verdict." [R. 327 at 5.] The Government likely ignored this claim because "inconsistent verdicts do not give rise to a sufficiency of the evidence challenge" unless the jury returns "a guilty verdict on mutually exclusive crimes." *United States v. McCall*, 85 F.3d 1193, 1198 (6th Cir. 1996) (citing *United States v. Powell,* 469 U.S. 57, 67-69 (1984)); *see also United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010) (noting inconsistent verdicts are unreviewable except in cases "where a guilty verdict on one count necessarily excludes a finding of guilt on another.").

performed by mid-level providers—on days he was out of the country. But Chaney summarily argues that the "actual proof in the record—the hospital billings themselves—did not correspond to the Government Exhibit [summarizing those billings], in that they did not show Dr. Chaney himself performed all the services identified in the Government Exhibit." [*Id.*] He provides no citation to this alleged "actual proof in the record," however, and otherwise fails to address the relationship between any of the twenty-eight counts of which he was convicted and the more than one thousand pages of hospital billings introduced by the Government. The Court reminds Dr. Chaney's counsel that vague allusions to "the record," without any effort at citation or detailed argument, are insufficient to support a motion for acquittal. And "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n,* 59 F.3d 284, 293-94 (1st Cir. 1995); *accord United States v. Hayter Oil Co.*, 51 F.3d 1265, 1269 (6th Cir. 1995).[10]

In any event, the Court's review of the "actual proof in the record" does not support Dr. Chaney's claim. At trial, FBI Agent Thad Lambdin confirmed that he had personally compared the "hospital records" summarized in Government Exhibit 504 to the "hospital billings from the Indictment," and that the exhibit entries corresponded to the dates on which the Chaneys were out of the country. [R. 316 at 110, R. 317 at 94-95.] A simple review of the "hospital billings themselves" reveals that for every date on which Dr. Chaney was out of town, there is a corresponding hospital record from that day listing Dr. Chaney as the attending physician. *See*

---

[10] Unfortunately, the United States' response does not do much better, arguing only that "evidence was presented" showing that "the Chaneys billed Medicare or Medicaid for hospital visits" on days they were on vacation. [R. 310 at 12.] This claim also contains no citation to the trial record.

Exhibits 151-192. The record at Exhibit 159,[11] for example, contains Dr. Chaney's signature beneath a written statement that "the patient was seen and examined by the attending physician" on March 8, 2013, though the Chaneys were out of the country from March 7 to March 10.[12] Likewise, the record at Exhibit 167A[13] lists Dr. Chaney as the "ordering provider" on September 15, 2013, though the Chaneys were out of the country from September 13 to September 16.

Hoskins also testified that he found "there [were] times that [Dr. Chaney] had signed" these records even though "he had not been to the hospital." [R. 293 at 68.] He recalled looking at medical charts at the hospital and saying to patients, "Well, I see Dr. Chaney's seen you this morning," though the patient would often respond, "No. I haven't seen Dr. Chaney today." [*Id.*] And Brenda Allen, a Clinique staff member who handled medical billing, testified that she advised Dr. Chaney not to bill under his own name for services rendered by other providers at the hospital, though he "continued to bill" as if he saw them. [Tr: Allen Direct Examination at 19-22.] These facts, viewed in a light most favorable to the prosecution, certainly provide enough evidence to support his conviction.

Fourth, the Chaneys seek reversal of their convictions for committing health care fraud on March 19, 2013. [R. 298-1 at 11, R. 296-1 at 9.] Kathy Rutledge, an auditor employed by the Government, calculated that the Chaneys billed $17,435 to insurance providers for a wide variety of services allegedly performed on this date. [TR: Rutledge Direct Examination at 54.] Parker also testified that in order to provide all of the documentation appearing in these records, he would "have to ask [patients] 1,842 questions," counsel the patients in "442 areas," and examine "549

---

[11] Exhibit 159 directly corresponds to Count 159 of the indictment. [R. 190 at 30.]

[12] The indictment lists the dates on which the Chaneys were out of the country. [*Id.*] The Government laid a foundation for these dates at trial, including the introduction of flight records. [R. 316 at 20.] The Chaneys do not challenge the accuracy of these dates.

[13] Exhibit 167A directly corresponds to Count 167 of the indictment. [R. 190 at 30.]

areas of the body." [*Id.* at 65.]  He thus concluded that it would have taken him approximately
"26 hours to actually do the clinical work that's documented on these 52 patients." [R. 244 at 65.]
The Government adds that Dr. Parker's assessment was "generous," given that "he did not consider
the dozens of other patients seen by mid-level providers that day, despite Mr. Chaney's obligation
to supervise these individuals and sign the prescriptions for controlled substances these providers
were issuing," nor did he "consider the ten hospital visits Mr. Chaney allegedly performed on this
date." [R. 310 at 13.]  Numerous witnesses also testified that the Clinique's frenetic pace made it
impossible for providers to fill out patient charts in the time allotted, and so the Chaneys would
fabricate medical records on the weekends to make up for the missing charts. *See infra* at 44-45.

In response to this evidence, Dr. Chaney offers the puzzling claim that "it does not matter
whether patients were seen quickly, with or without physical exams," because "[t]he issue is
whether Defendants billed improperly for those visits, and the government presented no evidence
the visits were improperly billed." [R. 298-1 at 11.]  Needless to say, it does matter.  Evidence
that a physician billed for a single day of services that would have taken the Government's expert
at least twenty-six hours to provide, even in the absence of specific evidence about "how much
was billed for each patient's visit," provides sufficient circumstantial support for the Chaneys'
conviction.  This count also does not charge the Chaneys with fraudulently billing for a specific
patient visit on March 19, but broadly charges the Defendants with a single count of health care
fraud for any and all activity occurring on that date.  [R. 190 at 31-32.]  Given (1) the dubiously
thorough documentation appearing in the medical records from this day, (2) the expert testimony
establishing the implausibility of actually providing these services in a single day, and (3) the
evidence that the Clinique billed insurance providers more than $17,000 for these supposed

services, the Court finds that the Government introduced enough "evidence as a reasonable mind might accept to support [the jury's] conclusion." *Chavis*, 296 F.3d at 455.

Mrs. Chaney relatedly claims there was "no evidence that [she] knew what had been billed for on March 19, 2013, or that she knew or had any capacity to know what services had or had not been provided as billed." [R. 296-1 at 9.] Although she concedes that proof of her "presence [at the Clinique] is not strictly necessary" to support her conviction, she also suggests "[t]here was no evidence that she was even present at ACM on March 19, 2013." [R. 296-1 at 9.] As described in greater detail later in this order, the evidence at trial established that Mrs. Chaney was the full-time CEO of the Clinique, that only she set the schedule, that she would triple- and quadruple-book patients, that "there was clear indication . . . there were too many patients, too long of a wait," that she fabricated patient charts, that she forged Dr. Chaney's signature on medical records, and that she "knew what the billings were." [R. 267 at 11]; *see also infra* at 16-17, 43-47. The Government did not need to show that Mrs. Chaney personally shepherded patients in and out of the office on March 19 to support her conviction. This strong circumstantial evidence was enough. *See, e.g., United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.").

Fifth, the Chaneys dispute the jury's conclusion that they fraudulently billed for nerve conduction studies performed by unqualified personnel. [R. 298-1 at 12, R. 296-1 at 9.] Combs testified that he conducted these tests, despite having only a high school education and no medical training. [R. 267 at 14.] The Government's expert, Dr. Berman, stated that nerve conduction studies "are very complex" and require a "technician [who] has special training and recognition

by a nationally-recognized organization." [Tr: Berman Direct Examination at 19.] And Rutledge presented "claims data" from Medicare and Medicaid showing that the Clinique routinely billed under specific procedure codes, including "99504," that are used to signify the performance of a nerve conduction study. [TR: Rutledge Direct Examination at 43-45.]

Dr. Chaney believes Rutledge's testimony was insufficient because "[t]here is no evidence in the record that billing code 99504 is the only nerve conduction test CPT code or that this particular code is the one to which Dr. Berman was referring." [R. 298-1 at 12.] But Dr. Berman's testimony did not concern a specific nerve conduction study or a "particular code." Instead, he generally described the nature and complexity of nerve conduction studies, and stated that performing any such study required "special training and recognition by a nationally-recognized organization." [TR: Berman Direct Examination at 18-19.] The evidence at trial did not suggest, and the Chaneys do not propose, that any machine other than the one used by Combs could plausibly qualify as a nerve conduction study. Given that (1) Dr. Berman stated nerve conduction studies are "very complex" and require "special training," (2) the Clinique billed for nerve conduction studies, and (3) the staff member who performed these studies had a high school education and no medical training, a "rational trier of fact could have found the essential elements of [this] crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Lastly, the Court will briefly address Mrs. Chaney's overarching claim, scattered throughout her motion for acquittal, that the evidence was insufficient to support her conviction for knowingly "aiding and abetting" these crimes. [R. 296-1 at 8-10.] The Court reiterates its previous holding that this argument, "like all of [Mrs. Chaney's] challenges to the evidence introduced against [her], fails to appreciate the distinction between circumstantial and direct

evidence." [R. 267 at 15.] Mrs. Chaney repeatedly argues that the Government failed to present direct evidence of her knowledge about specific prescriptions and/or billings. This evidence overlooks some of the direct evidence of Mrs. Chaney's involvement in the Clinique's operations; even Dr. Chaney conceded, for example, that the office's billing and collection instructions sometimes contained the notation "per Lesa" in the margins. [R. 319 at 124, 131, 152.] More importantly, direct evidence of this knowledge—which would include, presumably, Mrs. Chaney signing her name next to specific fraudulent billings or announcing in the presence of witnesses that she knew her conduct was unlawful—was not necessary to sustain her conviction. As the jury instructions explained, "[t]he law does not make any distinction between" circumstantial and direct evidence, "or say that one is any better evidence than the other." [R. 272 at 7.] The jury, faced with the enormous body of evidence summarized in this order, *infra* at 43-47, reasonably found Mrs. Chaney guilty of these crimes.

But even if the Chaneys' claims fail under Rule 29, Mrs. Chaney insists that the Court should still grant her a new trial under Rule 33(a).[14] [R. 296-1 at 4.] Under this rule, the Court may reverse the jury's judgment if "the verdict was against the manifest weight of the evidence." *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006). Unlike Rule 29, Rule 33 empowers the Court to "act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes,* 505 F.3d 578, 593 (6th Cir. 2007). In assuming this unwieldy role of a "thirteenth juror," however, the Court must remain sensitive to the sacred role of the jury as the preferred arbiter of a defendant's guilt or innocence. *Cf. United States v. Lockhart*, 2013

---

[14] Dr. Chaney apparently does not seek a new trial on these grounds, although he does make a general request for reversal in the "interests of justice" at the conclusion of his motion for new trial. *See infra* at 50. To the extent that Dr. Chaney argues the "manifest weight of the evidence" demands reversal of his conviction, the Court relies on the analyses above and below to reject that claim.

WL 6669818, at *1 (E.D. Ky. Dec. 18, 2013) ("Our system casts the jury, not the Court, as the star of the criminal trial."). That is why courts will reverse the jury's verdict "only in the extraordinary circumstance where the evidence preponderates *heavily* against the verdict." *United States v. Freeman-Payne*, 626 F. App'x 579, 584-85 (6th Cir. 2015) (internal quotations and citation omitted) (emphasis in original).

The evidence does not so preponderate here. At best, Mrs. Chaney reiterates the same plausible arguments that she raised at trial. Although these defenses were not frivolous, the Government effectively countered her claims with a substantial array of evidence that strongly established her guilt. *See infra* at 43-47. The jury likewise rejected her arguments, and the Court finds no "extraordinary" basis for replacing their judgment with the Court's. *Freeman-Payne*, 626 F. App'x at 584-85.

**B**

Both Defendants also move for a new trial on the basis of alleged juror misconduct. [R. 297-1, R. 299-1.] This accusation rests on new information provided by an alternate juror in the wake of trial. The timeline of events leading to the discovery of this information—including, most notably, what the Court knew and when the Court knew it—is critical to resolving the Chaneys' allegation. This timeline proceeds as follows: On the fifth day of the Chaneys' trial, a court clerk briefly relayed to the Court some information that she had received from the jury administrator about a recent conversation between the administrator and one of the trial's alternate jurors. The administrator told the court clerk—and the clerk then told the Court—that this alternate had expressed "some frustration with the process" and "concerns about how serious[ly] the jury was taking their duty." [R. 291 at 3, TR: 4/20/16 Telephonic Conference at 7.] The clerk did not

18

provide any detail about the specific comments and/or behavior that apparently caused the alternate's concern, and the alternate did not report any of these concerns to the Court.

Armed with only a skeletal, third-hand allusion to one alternate's frustration, the Court determined that further investigation would be premature. But in an effort to uncover any concerns that might actually warrant an investigation, the Court immediately instructed the jury that if "any issues . . . relate[d] to the jury instructions" arose, they should "bring those to [the Court's] attention." [TR: Trial, Day 5 at 1.] Despite this instruction, the Court never heard from the alternate or any other juror.[15]

The timeline then jumps to the day after the close of trial. On this day, the same alternate called the law offices of Dr. Chaney's counsel and left a voicemail. The alternate identified herself as a juror in the Chaneys' trial, and suggested that counsel would be "glad if [she] called her" back. [TR: 4/20/16 Telephonic Conference at 3.] Counsel reported this message to the Court, and the parties promptly convened for a telephonic conference. At the conference, the Court reminded the parties that Fed. R. Evid. 606(b) constrained its investigation of the alternate's claims. [*Id.* at 9.] This rule states that a "court may not receive a juror's affidavit or evidence of a juror's statement" about any internal influence that may have affected "that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1); *see also United States v. Logan*, 250 F.3d 350, 380 (6th Cir. 2001) (noting that Rule 606(b) "prevents the unwarranted badgering of jurors that would invariably arise in its absence in an alleged attempt to search for the 'truth'" and "provides jurors with an inherent right to be free from interrogation

---

[15]  In her *in camera* interview, the alternate suggests that she did report additional concerns to the administrator after this instruction. This time, however, the alternate indicates that the administrator said she "wasn't going to tell [the Court]," and that the alternate should just "tell them not to do that." [R. 290 at 6-7.] As discussed later, *infra* at 19-20, 31-32, none of these additional accusations suggested that the jurors were deliberating prematurely.

concerning internal influences on the decision-making process."). But an exception to this rule applies when the evidence relates to "extraneous prejudicial information [that] was improperly brought to the jury's attention" or "an outside influence [that] was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(A)-(B).[16]

At the time, neither the Court nor the parties knew if the alternate's allegations concerned potentially "extraneous" or "outside" influences. Without this information, the Court decided that additional investigation was necessary. About a week later, the Court conducted an *in camera* interview with this alternate, and later agreed to file that interview in the record under seal. [R. 291.] This interview revealed that all of the alternate's concerns related strictly to alleged internal influences on the jury's decision-making process. In total, the alternate identified four events during the course of trial that she felt were "inappropriate." [*Id.* at 7.] First, she reported overhearing two jurors "talking about the case" immediately after the Government's opening statement; specifically, she remembered these jurors making a comment about pictures of "Dr. Chaney's house" that the Government had shown in its opening statement. [*Id.* at 6.] She then allegedly told these jurors that they "should[n't] be talking about that," to which they responded, "We can talk about it in here." [*Id.*] Another juror replied, "We can't," and then added, "It's right on the wall there." [*Id.*] Second, the alternate stated that after an "elderly lady testified" sometime

---

[16] In July 2016, the Chaneys also filed a joint motion for permission to interview an additional juror in this case. [R. 353.] They attached an affidavit from Dr. Chaney's brother describing a conversation he allegedly had with this juror, and suggested that the affidavit supplied grounds for further inquiry. [*Id.* at 1.] The Court agreed and later submitted a questionnaire to this juror. [R. 367.] The juror's comments on this questionnaire indicated no concerns about external influences on the jury's deliberation process. He answered "No" when asked if any juror had brought "up information that he or she had learned outside of the courtroom" or called "the jury's attention to information that was not presented as evidence during the trial." [R. 367 at 5.] Although he also expressed some concern about the unanimity of the verdict, his comments related only to alleged internal influences on the deliberation process. Rule 606(b) prohibits the Court from considering this evidence. The Court incorporates by reference its discussion of this issue at DE 367, pp. 1-2.

20

later, one of these same two jurors said counsel "shouldn't have treated her that way, whatever they meant, you know." [*Id.* at 7.] Third, she indicated that one of these same jurors "got attracted" to Dr. Chaney's counsel and "made it known" to the other jurors. [*Id.* at 7.] Finally, she recalled hearing a third juror declare that she knew "how many lights" were "in the ceiling" after a particularly long bout of testimony. [*Id.* at 8.] Apart from these three jurors, the alternate emphasized that "all of [the others] took it seriously." [*Id.* at 10.]

After the Court filed a transcript of this interview in the record, the Chaneys requested permission to conduct even "further inquiry and investigation" into the alternate's claims. [R. 297-1 at 3.] Because the alternate's account revealed no concerns about any external influences on the jury's deliberation process—and because Rule 606(b) expressly prohibits post-verdict investigation of any other influence on this process—the Court denied that request. [*Id.*] In their motions for new trial submitted shortly thereafter, the Chaneys argued that the jurors' alleged misconduct, coupled with the Court's treatment of these allegations before and after the verdict, deprived them of their right to a fair trial.

In response, the Government maintains that "[t]here is absolutely no evidence the jurors began discussing their verdict" before formal deliberations began, and a "passing reference to the Chaneys' house is not evidence of deliberation." [R. 311 at 4.] They likewise claim that the Chaneys now "seek to invade the province of the jury in a matter clearly prohibited by [Rule 606(b)] and long-established case law." [*Id.* at 7.] Although the Court agrees with both of these propositions, the Government's argument overlooks one additional basis for the Chaneys' motion. The Chaneys do not simply challenge the Court's handling of these claims after the jury reached its verdict; they also argue that "the Court was aware . . . that jurors were prematurely discussing

the evidence during the trial, although the parties were not made aware of the situation." [R. 326 at 1-2.] According to Dr. Chaney, then, another "issue presented . . . is whether the Court erred in failing to advise the parties at the time this information came to the Court's attention and whether the Court failed to make sufficient inquiry into what it described in a post-verdict in camera interview as 'concerns about how serious[ly] the jury was taking their duty.'" [*Id.* at 2.]

The problem with this claim, however, is that it presumes the Court was aware of the alternate's detailed accusations prior to the jury's verdict. It was not. As the Court has already stated on the record, a court clerk briefly reported to the Court on the fifth day that the jury administrator had heard one alternate expressing "some frustration with the process" and "concerns about how serious[ly] the jury was taking their duty." [R. 291 at 3, TR: 4/20/16 Telephonic Conference at 7.] That is a far cry from being "aware" that jurors were prematurely deliberating. The clerk never indicated to the Court that a juror had commented on pictures of the Chaneys' house, nor did she report any of the alternate's additional concerns. All of these claims appeared for the first time in the alternate's post-verdict interview. The Court could not have alerted the parties to these allegations prior to discovering that they existed.

The relevant question, then, is not whether the Court *would* have investigated the alternate's detailed post-verdict allegations had it received those complaints prior to the jury's verdict; rather, the question is whether the Court *should* have investigated the third-hand, generalized report of concern that it actually received at the beginning of trial, without the benefit of those post-verdict details.

With this narrow question in mind, the Court turns to the body of case law governing the responsibility of a trial judge to investigate allegations of juror misconduct. In *United States v.*

*Shackelford*, 777 F.2d 1141 (6th Cir. 1985), the Sixth Circuit held that "[w]hen possible juror misconduct is brought to the trial judge's attention[,] he has a duty to investigate and to determine whether there may have been a violation of the sixth amendment." *Id.* at 1145. What neither *Shackleford* nor any Sixth Circuit precedent squarely addresses, however, is what type of alleged behavior qualifies as "possible juror misconduct" sufficient to trigger a court's "duty to investigate." Common sense holds that not *all* information "brought to the trial judge's attention" necessarily activates this duty. In *Schackleford*, the "possible juror misconduct" involved a juror who left the jury room during deliberations, interacted with his wife for a few minutes, and then returned to the deliberation room shortly before the jury reached a guilty verdict. *Id.* at 1144. On these facts, the potential for juror misconduct—including the possibility of an outside influence on the deliberation process—was specific and clear. But suppose, for example, that a jury administrator simply informed the Court that one juror had raised her voice in the deliberation room, or that she had arrived from her lunch break ten minutes late. There is plainly a spectrum of information that a court may receive about a juror's conduct at trial. And in order to prevent unwarranted and disruptive intrusions into the jury room, trial judges must retain some discretion in determining what information does, or does not, generate a duty to investigate. *Cf. Logan*, 250 F.3d at 380.

The Sixth Circuit acknowledged this spectrum in *United States v. Holloway*, 166 F.3d 1215 (6th Cir. 1998) (unpublished table opinion). In *Holloway*, the Court briefly analyzed a case of the Third Circuit, *United States v. Resko*, 3 F.3d 684, 690-91 (3d Cir. 1993). The court in *Resko* granted the defendant a new trial because "the district court [had] failed to engage in any investigation beyond [a] cursory questionnaire" after "every juror [had] admitted [in the middle of

trial] to partaking in premature discussions." *Id.* at 690.  Distinguishing that case from the one

before it, the *Holloway* court noted that "the *Resko* court admitted that it faced a 'difficult' case

. . . and limited its holding to instances where 'unequivocal' evidence of misconduct arises mid-

trial." *Holloway,* 166 F.3d at *5 (quoting *Resko*, 3 F.3d at 694).[17]

       Three sister circuits also provide some instructive analysis of where to draw this line.  In

*United States v. Stafford*, 136 F.3d 1109 (7th Cir. 1998), a juror sent a note directly to the trial

judge "asking whether the alternate juror (whom the judge had said she would select after the

closing arguments) could 'stay in the jury room to hear the sentencing.'" *Id.* at 1112.  The

defendant argued that the juror's reference to "sentencing" indicated this juror had already

presumed the defendant's guilt, and faulted the trial judge for not holding "a hearing at which the

identity of the juror who had sent the note would be established and that juror and perhaps the

other jurors could be quizzed by the judge about the meaning of the note." *Id.*  The *Stafford* court

found that "[s]uch a hearing would be routine in a case in which jury misconduct was alleged and

the allegation was sufficiently substantiated to warrant a further inquiry." *Id.*  But the court also

qualified that "[n]ot every allegation of jury misconduct is sufficiently substantial or sufficiently

well substantiated to warrant putting the jurors on the spot in this fashion." *Id.*  The reason for this

exception was intuitive: "Quizzing a juror, or perhaps all the jurors, in the middle of a trial is likely

to unsettle the jury, and the judge is not required to do so unless there is a much stronger indication

of bias or irregularity than there was in this case." *Id.* at 1113 (citing *White v. Smith,* 984 F.2d

163, 166-67 (6th Cir. 1993)).

---

[17]  Because the issue in *Holloway* concerned only post-verdict allegations of juror misconduct, the court's
discussion of the standard for reviewing mid-trial allegations did not control the outcome.  But the court's
recognition of *Resko*'s limitation remains relevant to this Court's analysis.

Likewise, in *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011), a juror sent a note directly to the trial judge stating "that [he] had overheard fellow jurors making 'statements in private that they will make sure [the defendants] go to jail.'" *Id.* at 1278. The court "considered the note and decided to (1) instruct the jurors once again on the presumption of innocence and (2) direct them to refrain from coming to premature conclusions." *Id.* The court also "periodically reminded the jurors of their duty not to deliberate," and "polled each juror" on the last day of trial "to ensure that the panel 'had complied with all of the Court's instructions.'" *Id.* at 1278. In evaluating the sufficiency of this response, the *Bradley* court noted that "[t]he district court's discretion . . . is at its zenith when the alleged misconduct relates to 'statements made by the jurors themselves, and not from media publicity or other outside influences.'" *Id.* at 1277 (quoting *Grooms v. Wainwright,* 610 F.2d 344, 347 (5th Cir. 1980)). Although the court "would have preferred that the [trial] court take more aggressive action," it ultimately concluded "that the district court did not err when it forewent a full investigation into juror impartiality in favor of a less intrusive remedy." *Id.* at 1280.

The Second Circuit also faced a similar scenario in *United States v. Abrams*, 137 F.3d 704 (2d Cir. 1998). There a juror sent a note directly to the trial judge stating that there were "several jury members that [were] new to the judicial system," and asking the judge to "remind them about discussion prior to going to deliberation." *Id.* at 705. The trial judge chose not to interview or poll the jurors in response to this note, and instead "brought the jurors back to the courtroom and told them that he had mistakenly neglected to instruct them not to discuss the case among themselves until deliberations begin, explained that this practice was preferred because the government presented its case first, and directed them not to discuss the case until they ha[d] heard all of the

evidence." *Id.* at 706. On appeal, the *Abrams* court found that the trial judge's response was proper. The court stressed that the mid-trial interrogation of jurors "is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident." *Id.* at 708. The court also noted that "the [jury] note did not explain the nature of any discussions or even indicate whether such discussions had taken place," and therefore "the possibility of any far-reaching conversation regarding views on the case was minimal and any possible prejudice unlikely." *Id.* Because "[t]he circumstances surrounding the note suggest[ed] that if any discussions had taken place, they were insignificant," the court found that "the district court did not abuse its discretion in deciding to deal with the juror's note solely by giving a curative instruction." *Id.*

The information available to this Court was substantially more ambiguous than that provided in *Stafford*, *Bradley*, or *Abrams*. Here, the Court had only a third-hand report of some concern that jurors were "not taking their duties serious[ly] enough," and certainly had no reason to believe that jurors were actually discussing the defendants' guilt or innocence, much less that they intended to "make sure [the defendants went] to jail." *Bradley*, 644 F.3d at 1278. Given the nebulous nature of this report, the Court determined that "basic remedial action" was necessary in lieu of a more "intrusive remedy." *Id.* at 1278, 1280; *see also United States v. Bostick*, 791 F.3d 127, 154 (D.C. Cir. 2015) ("'We have explicitly rejected any automatic rule that jurors are to be individually questioned' about alleged misconduct.") (citation omitted). The Court thus immediately chose to instruct the jury that if they had "any issues that relate[d] to the jury instructions," they should "bring those to [the Court's] attention." [TR: Trial, Day 5 at 1.]

In the days before and after this event, the Court also repeatedly provided the jury with explicit and careful instructions about prohibited juror communications. On the fourth day, for example, the Court reminded the jury that "[t]he only evidence you can consider is what you're hearing here in court as the trial unfolds," and "[y]ou ought not to be commenting on the evidence or engaging in conversation about the case amongst yourselves." [TR: Trial, Day 4 at 113.] On the fifth day, the Court again instructed, "I'd remind you of those instructions that I've given to you. Of course, they continue to be in full force. You're not to comment on the evidence or begin discussing the case amongst yourselves or consider outside information and, of course, continue to keep an open mind as the trial unfolds." [TR: Trial, Day 5 at 89.] The next day, the Court once again told the jury that "[i]t's really important" to "remember that the only evidence that you can consider is that which is here in court," adding that jurors should not "communicat[e] with each other" or "start commenting on the evidence." [TR: Trial, Day 6.] And on the seventh day, the Court reminded the jury that they could not "communicate about the case," that doing so would "violate [their] oath[s]," and that they must "keep an open mind as the trial unfolds." [TR: Trial, Day 7.] These habitual instructions continued until the end of trial over a month later. In the absence of any evidence that the jury had actually begun deliberating prematurely, the Court reasonably assumed that they would follow these instructions. *See, e.g. United States v. Starnes*, 552 F. App'x 520, 523-24 (6th Cir. 2014) ("[W]hen a court instructs a jury to do something, there is a strong presumption that the jury will follow that instruction.") (citation omitted).

But that is not quite the end of the Court's analysis. In addition to faulting the Court for choosing not to conduct further investigation into the court clerk's comment, the Chaneys also challenge the Court's decision not to bring this issue to the attention of the parties at trial. Under

Fed. R. Crim. P. 43, defendants have a right to be present at "every trial stage, including jury empanelment and the return of the verdict." The Sixth Circuit interprets this provision to require the defendant's appearance only when "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *United States v. Patterson*, 587 F. App'x 878, 884 (6th Cir. 2014) (internal quotations and citation omitted). To some extent, then, the Chaneys' declaration of a right to be present here simply begs the question, as the ultimate issue is whether the court clerk's vague report raised "substantial" enough concerns to warrant any response from the Court.[18] *See id.* at 885 (finding no Rule 43 concerns in part because the disputed "event was a relatively minor occurrence in the context of a two-week trial."); *United States v. Taylor*, 489 F. App'x 34, 43 (6th Cir. 2012) (noting that Rule 43 only implicates a defendant's "right to be present at *critical* stages of the proceedings") (emphasis added). As the Court has already explained, this ambiguous information was not sufficiently substantial to require that response.

But even if the Court's decision somehow violated Rule 43, the Supreme Court has expressly held that "a violation of Rule 43 may in some circumstances be harmless error." *Rogers v. United States*, 422 U.S. 35, 35 (1975). To determine whether an error was harmless, courts ask if "the district court's conduct" created "a reasonable possibility of prejudice." *United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993). The Court struggles to identify how the events in dispute created such a possibility. Dr. Chaney argues that, "[h]ad Defendants known of the jury's

---

[18] Rule 43 also does not apply when the decision at issue is purely "one of law." *United States v. Taylor*, 489 F. App'x 34, 44 (6th Cir. 2012) (quoting *United States v. Jones*, 381 F.3d 114, 122–23 (2d Cir. 2004)). The question in dispute here—whether the clerk's report was "sufficiently substantial" to warrant further inquiry—was arguably a question of law for which Rule 43 does not apply. But in an abundance of caution, the Court will proceed with a Rule 43 analysis.

violation[s] . . . they would have moved for a mistrial or, alternatively, for a dismissal of the two jurors in question." [R. 299-1 at 2.] This argument, of course, makes the same mistake of assuming that the Court could have relayed information about these two jurors' "violations" before the jury's verdict. The only information available to the Court at that time was the third-hand, generalized report of one alternate's "frustration with the process" and "concerns about how serious[ly] the jury was taking their duty." [R. 291 at 3, TR: 4/20/16 Telephonic Conference at 7.] For the same reasons explained throughout this order, the Court certainly would have denied a motion for a mistrial or dismissal on the basis of that information alone.[19] And even if the Court had investigated the alternate's ambiguous report and discovered the information revealed later, none of the alternate's detailed post-verdict allegations were sufficiently serious to warrant a mistrial. *See infra* at 31-32.

The Chaneys counter by citing *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975). In *Gay*, the court considered a defendant's "charge that the '[trial] court erred in excusing jurors already impaneled and sworn without the presence of [the defendant], his lawyer or explanation of reasons for excusing [these] jurors.'" *Id.* at 433. The court noted that a trial judge enjoys considerable "discretion . . . to dismiss a juror and replace him with an alternate," but this "discretion is always subject to review for abuse, and a record is necessary for such review." *Id.* at 435. In the "total absence of a record of the proceedings in which the changes in the makeup of the jury occurred," the Court found that it was "require[d] . . . to assume prejudice." *Id.*

---

[19] Counsel also claims that "[e]ven had these motions been denied, the subsequent complaint would have caused these motions to have been renewed," and "they would have sought a mistrial when the attorney for the United States commented on Defendant Lesa Chaney's failure to testify." [R. 324 at 6.] In view of the same facts and legal conclusions discussed above and below, however, these renewed motions would have also been denied.

The Chaneys argue that here, because there is no "record" of the Court's inaction in the aftermath of the court clerk's report, the Court is also "require[d] . . . to assume prejudice." [R. 299-1 at 4, R. 297-1 at 7.] But the facts of this case are strongly distinguishable from those in *Gay*. The animating concern in *Gay* was that the trial court *did* conduct further proceedings—and in fact took dramatic, affirmative action on the basis of those proceedings—without the defendant's presence. A record could and should have been created in that context, and the court appropriately presumed prejudice in its absence. Here, however, the Court determined that the clerk's report was insufficient to warrant a hearing of any kind. This case is more like *Harris*, 9 F.3d 493, where the defendant faulted a trial judge for (1) failing to notify defense counsel after receiving a jury note and (2) failing to take any significant action after receiving this note. The defendant argued that "prejudice exist[ed] . . . because he was not given an opportunity 'to frame an answer that was specific to the jury's concerns.'" *Id.* at 493. But the court held that "[t]his claimed prejudice simply restates the obvious, for the failure to notify parties of a jury note necessarily results in a lack of opportunity for the parties to respond." *Id.* The court added that the "[trial] court did not make a substantive response to the jury's note," and held that it could not "conceive" of any "reasonable possibility of prejudice that resulted from the district court's conduct." *Id.*

The *Harris* court did not express a concern about the district court's failure to create a "record" for one evident reason: the trial judge found no basis for providing "a substantive response to the jury's note," and so no activity occurred from which a record could be created. *Id.* The same reasoning applies here. The present question is not whether the Court erred in failing somehow to create a record of its own inaction; the question is whether the Court erred in determining that the clerk's vague, third-hand report of one alternate's frustration—which

contained no detailed accusations and no grounds for suspecting that jurors had actually deliberated prematurely—was insufficient to warrant a response from which a record could be created. For the reasons explained above, the Court did not err in reaching this conclusion.

The Court adds, finally, that every dimension of this inquiry leads to the same question: whether the jurors' conduct deprived the Chaneys of their right to a fair trial. The court in *Gay* reversed the trial court because, in the "total absence of a record," it could not possibly determine whether the trial judge's affirmative actions had violated this right. *Gay*, 522 F.2d at 433. And the court in *Resko* reversed the trial court because "there [was] no way to know the nature of" the premature deliberations to which the jurors had admitted, including "whether they involved merely brief and inconsequential conversations about minor matters or whether they involved full-blown discussions of the defendants' guilt or innocence." *Resko*, 3 F.3d at 690-91. In this case, however, the Court possesses a comprehensive record of the alternate's accusations. As Mrs. Chaney herself underscores, "[w]e do not operate in a vacuum here." [R. 324 at 6.] The alternate's recorded interview provides a meticulous account of the discussions that she felt were "inappropriate"—so meticulous, in fact, that she also describes a number of events that are largely irrelevant to any concern about premature deliberations, including one juror's declaration of boredom and another's comment about the physical appearance of an attorney.[20] [R. 291 at 7-8.]

And to the extent that a comment about "Dr. Chaney's house" does imply some possibility of premature deliberation, this single statement hardly amounts to a "full-blown discussion[ ] of the defendants' guilt or innocence." *Resko*, 3 F.3d at 91. Courts have consistently held that "when

---

[20] The Court recognizes that consideration of this evidence risks violating Rule 606(b). But this rule prohibits the use of certain evidence to impeach the "validity of a verdict." *Id.* Because the inquiry here is not strictly about the validity of the verdict, but about the potential for prejudice caused by the Court's response to the clerk's report, the Court will briefly address the details of the alternate's account.

there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decision making has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *United States v. Gianakos*, 415 F.3d 912, 921-22 (8th Cir. 2005) (emphasis in original) (quoting *Resko*, 3 F.3d at 690); *see also United States v. Williams-Davis*, 90 F.3d 490, 505 (D.C. Cir. 1996) (finding that "[t]he probability of some adverse effect on the verdict [caused by internal influences] is far less than for extraneous influences.").[21]    Here, the evidence indicates only that two jurors may have discussed pictures of the Chaneys' house at the very beginning of trial.  Other jurors apparently admonished them not to discuss the evidence again, and the remaining record—notwithstanding the alternate's additional accusations, none of which even plausibly describes deliberation about the Chaneys' guilt or innocence—suggests that the jurors proceeded to obey those instructions throughout the two-month trial that followed.  On these facts, the Court cannot identify any reasonable possibility of prejudice to the Chaneys' right to a fair and impartial jury.

Two other facts also strongly reinforce the conclusion that the alternate's claims do not mandate retrial.  First, the alleged comment about the pictures of the Chaneys' house occurred in response to the Government's opening statement.  [R. 291 at 6.]  The fact that two jurors may have commented on a single piece of evidence at the very start of the Government's case—but proceeded to refrain from such discussion for the remainder of a remarkably complex two-month trial—raises little concern about the jury's ability to keep an open mind throughout the presentation of the evidence.  Similarly, in *Bradley*, the court was "encouraged" by the fact that an alleged juror

---

[21]  The *Williams-Davis* court even noted that "some reformers have proposed completely doing away with the rule against intra-jury discussion of the case before the formal start of deliberations, presumably reasoning that jurors are mature enough to discuss the case during the trial in a tentative way, without settling into final opinions until the case is fully in."  *Williams-Davis*, 90 F.3d at 505.

comment "was made so early in the trial," as it "indicated that the jurors had merely been influenced, as was intended, by the Government's evidence to that date." *Bradley*, 644 F.3d at 1279. And in *Abrams*, the court emphasized that jurors "had only heard opening statements" prior to the alleged premature deliberations, and "[t]he jury had been instructed that opening statements [were] not evidence." *Id.* at 708. The court thus concluded that "any impact on the defendant's right to a fair trial from premature discussion among jurors on the first day of trial was minimal, and any questioning of jurors was likely to be intrusive and to magnify the episode." *Id.* at 708–09.

Second, the jury returned a carefully drawn split verdict on the Chaneys' 256-count indictment, finding the Chaneys guilty of many counts but acquitting them of over a hundred others. [R. 282, 283.] If this minor, isolated comment about the Chaneys' house—which did not directly pertain to any specific count of the indictment—had somehow tainted the jury's general impression of the Chaneys' culpability, it is curious that the jury nevertheless found them innocent of over a hundred charges. *See, e.g., United States v. Morales,* 655 F.3d 608, 633 (7th Cir. 2011) ("These split verdicts imply that the jury reached independent conclusions as to each defendant without making up its mind before the close of the evidence."); *Bradley*, 644 F.3d at 1279-80 (holding that evidence the jury "partially acquitted" defendants "provides circumstantial evidence that the jury did indeed 'consider[ ] the charges individually and assess[ ] the strength of the evidence as to each charge.'") (citation omitted).

Taking all of these facts into consideration, the Court finds no sound basis for granting the Chaneys a new trial on account of any alleged juror misconduct. The clerk's vague report of one alternate's frustration did not suggest that jurors were deliberating prematurely, the Court took

basic remedial action in the wake of this report, and the well-developed record reveals that this alleged misconduct—even accepted as true—did not prejudice the Chaneys' right to a fair trial. The Court will thus deny the Chaneys' motions on these grounds.

**C**

**i**

The Chaneys next move for a new trial on the basis of alleged prosecutorial misconduct. This claim springs from a comment made by the prosecution on the last day of trial.[22] In its closing argument, the prosecution told the jury that "[a]t one point [Greg Hoskins] told you [Mrs. Chaney] actually signed some prescriptions, said, 'You didn't see this,' forged Dr. Chaney's name. That's what Greg Hoskins told you." [R. 300 at 18.] Both Defendants immediately objected. At the bench, Dr. Chaney's counsel argued that the prosecution had "just told the jury something that [was] not true." [*Id.* at 19.] The Court then asked the prosecutor if Hoskins's statement was "in

---

[22] The Chaneys also briefly mention one prosecutor's alleged "comment[ ] on Mrs. Chaney's failure to testify." [R. 297-1 at 7.] During its rebuttal argument, the Government stated, "Remember, [Dr. Chaney is] the only one responsible, he said, for the pre-signed scripts . . . [and as for] Lesa Chaney, she never made a statement, except what's in the billing papers. But you saw her checks." [R. 300 at 124.] At the bench, the prosecutor indicated that "[a]s [he] was making that . . . statement, [he] recognized that it was going to be improper if [he] finished it that way, so [he] did alter it." [*Id.* at 125.] The Court immediately instructed the jury that Mrs. Chaney had an "absolute constitutional right not to testify" and they should not "use [her failure to testify] against any defendant in any way." [R. 300 at 127.] The Chaneys do not allege that this statement, without more, amounted to misconduct warranting a new trial. Instead, they argue that if they had known about the jurors' alleged premature deliberations in the context of trial, they would have moved for a mistrial after this prosecutor "commented on Mrs. Chaney's failure to testify." [R. 299-1 at 7, R. 297-1 at 8.] This claim still makes the same mistake of assuming that the Court was aware of these alleged premature deliberations during trial. It was not. In any event, the Government's comment was ambiguous, isolated, properly addressed by a curative instruction, and easily outweighed by the evidence against her. *See infra* at 43-47. A motion for any relief on the basis of this comment would fail. *See, e.g., Shaieb v. Burghuis,* 499 F. App'x 486, 495 (6th Cir. 2012) ("Unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions . . . we presume that the jury complied with the trial court's curative instruction.") (internal quotations and citation omitted).

evidence," to which he replied, "It is; I asked him about it.  It's [in] my notes.  I asked him about it."  [*Id.*]

The parties now agree that Hoskins never provided this testimony.  At the time, however, no transcript of Hoskins's testimony was available.  Without access to this transcript, the Court could not immediately determine if the Government's representation was accurate.  The Court thus instructed the prosecutor to "move on from that particular point," and reminded defense counsel that "you've got carte blanche to point out that there's not a shred of evidence for his theory that supports an accusation or statement that the government has made."  [*Id.* at 20.]  In their own closing arguments, both Defendants vigorously insisted that Hoskins had never made this statement.

The Chaneys now seek a new trial on account of the Government's misstatement.  In evaluating this claim, the Court will first ask "if the [the misstatement] was improper, and if it was," then "proceed to analyze whether it was flagrantly improper, such that reversal is required." *United States v. Johnson*, 581 F.3d 320, 329 (6th Cir. 2009).  To determine whether the prosecutor's statement was "flagrantly improper," the Court will "ask (1) whether [it] tended to mislead the jury; (2) whether [it was] isolated or pervasive; (3) whether [it was] deliberately made; and (4) whether the overall evidence against the defendant [was] strong."  *Id.*  And even if the prosecutor's conduct was not flagrant, the Court may still grant a new trial "if (1) proof of defendant's guilt [was] not overwhelming, *and* (2) defense counsel objected, *and* (3) the trial court failed to cure the error with an admonishment to the jury."  *United States v. Carroll*, 26 F.3d 1380, 1385–86 (6th Cir. 1994) (emphasis in original).  In applying each of these factors, the critical question "is whether the prosecutors' comments so infected the trial with unfairness as to make

the resulting conviction a denial of due process." *Girts v. Yanai*, 501 F.3d 743, 761 (6th Cir. 2007) (internal quotations and citations omitted).

**ii**

The Court need not waste time asking if this prosecutor's misstatement was improper. It was. *See, e.g., United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001) ("The law is clear that, while counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate evidence."). But the next step of the inquiry—which asks if the Government's statement "tended to mislead the jury"—causes the paths of the two Defendants to diverge. This is true for a simple reason: the prosecutor's misstatement concerned only Mrs. Chaney. This comment did not mention Dr. Chaney in any way, nor did it imply that he knew Mrs. Chaney had forged his signature on any prescription. Dr. Chaney still insists that the Government's "misrepresentation [was] crucial" to his defense, as "the jurors could have been convinced of Dr. Chaney's good faith in presigning prescriptions, but once they heard that Mrs. Chaney had signed his name, the jury could no longer accept this premise, since allowing someone else to sign his name to prescriptions would indicate a lack of good faith." [R. 299-1 at 5.]

There are two problems with this claim. First, the thrust of Dr. Chaney's "good faith" defense did not concern *who* pre-signed a particular prescription—after all, it does not require medical expertise to sign a blank notepad. Instead, Dr. Chaney's defense rested on (1) his "good faith" belief in the ability of the Clinique's unlicensed and unqualified medical staff to distribute pre-signed prescriptions for only legitimate medical purposes, and (2) the lack of evidence about the medical condition of each prescription's ultimate recipient. Evidence that Mrs. Chaney, rather than Dr. Chaney, signed at least one of these blank notepads did not substantially undermine this

36

defense.  But the jury rejected it.  And second, the prosecutor's misstatement did not indicate that Dr. Chaney "allowed" Mrs. Chaney to forge his signature on the day in question; rather, it failed to mention Dr. Chaney in any way, and implied (for self-evident reasons) that Dr. Chaney was not even present that day.  Nor did the prosecution ever argue, as a basis for the charges against Dr. Chaney, that he had allowed or otherwise encouraged Mrs. Chaney to forge his signature on prescriptions.  It remains possible, of course, that a juror might have independently drawn this unsupported inference.  But the Court finds no clear reason to believe that any juror made this connection.

Dr. Chaney nevertheless asks the Court to assume that (1) the jury actually drew this attenuated inference, (2) the inference also impacted the jury's deliberation of his guilt or innocence, and (3) this impact outweighed the deep, varied, and overwhelming body of evidence presented against him over the course of a two-month trial.  That the Court will not do.  The jury convicted Dr. Chaney after receiving evidence that he knowingly left pre-signed prescriptions for distribution by unlicensed and unqualified medical staff, told an employee "not to tell anyone" about the pre-signed scripts, shouted at employees to "fix" urine drug screens that showed signs of patients' drug abuse and/or diversion, somehow saw up to four patients every fifteen minutes, forced others to wait for up to eight hours to be seen, fabricated medical records, submitted fraudulent billings to public and private insurance providers, ordered an employee to obtain prescriptions unlawfully and divert them to Dr. Chaney for his own private use, and even

encouraged one patient to dissolve the pills he had prescribed and inject them.[23]  On these facts, one isolated comment about Mrs. Chaney's behavior—with no indication that Dr. Chaney was even aware of or encouraged this behavior—plainly fails to overcome the immense weight of the evidence against him.[24]

### iii

The impact of the Government's misstatement on Mrs. Chaney's defense, however, is more complicated.  Before measuring this effect, the Court should first determine which counts of the indictment are actually at issue.  To this end, the Court will divide Mrs. Chaney's charges into two broad categories: those that relate to the Clinique's pattern of pre-signing prescriptions, and those that do not.  This latter category includes the health care fraud charges listed in Counts 112-122, 197, and 234.  All of these counts rely upon facts wholly unrelated to Dr. Chaney's habit of pre-signing prescriptions, including evidence that the Clinique (1) billed insurance providers for unnecessary urine drug screens, (2) billed on March 19 for "a level of services [and] . . . a number of patients that could not have been performed in one day," and (3) billed for Combs's performance of nerve conduction studies.  [R. 190-1 at 26-37.]

---

[23]  *See, e.g.,*  R. 318 at 114-115, R. 321 at 19-21  (pre-signed prescriptions), R. 340 at 9, R. 339 at 7, (fixed urine drug screens); R. 335 at 10-11 (quadruple booking), R. 344 at 19, R. 336 at 5 (quadruple booking and up to eight hour wait), R. 293 at 51-52, R. 321 at 101 (fabricated medical records), R. 244 at 86, R. 317 at 94-95, R. 267 at 9, TR: Youlio Direct Examination at 7, R. 244 at 65,  R. 298-1 at 9, TR: Rutledge Direct Examination at 43-45 (fraudulent billings), R. 321 at 127-130 (diversion of pills for private use), TR: Charles Hicks Testimony at 13-14 (injecting dissolved pills).

[24]  For a similar reason, the one category of charges of which the jury found only the corporate defendant guilty—Counts 221-233, which involved Combs's use of pre-signed certificates of medical necessity to sell back braces—is irrelevant to the prosecutor's misstatement.  Combs readily admitted to this practice, but testified that the Chaneys did not profit from it in any way.  [R. 281 at 86-87.]  Although the jury found the Clinique guilty of those charges because of its association with Combs, it acquitted both Mrs. Chaney and Dr. Chaney of these counts.  The prosecutor's isolated reference to a single, unrelated comment made by Mrs. Chaney could not have prejudiced the Clinique's defense on these charges.  And in any case, the evidence of Combs's unlawful sale of these braces was overwhelming.  [*See generally* R. 281.]

In her discussion of the prosecutor's comment, Mrs. Chaney largely ignores these charges and focuses instead on the relationship between this misstatement and the jury's "guilty findings as to the drug and drug related charges." [R. 297-1 at 2.] In one tangential sentence, however, she does offer the unelaborated claim that "[i]f the [misstatement suggested] Mrs. Chaney so knowingly and wrongfully joined in the drug conspiracy, it could likewise be inferred that her involvement in the many varieties of health care fraud was not so benign and exculpatory as it otherwise appeared." [R. 297-1 at 12.] But even accepting that the Government's misstatement "tended to mislead the jury" about the "drug and drug related charges," the Court finds no plausible grounds for suspecting that this single comment impacted the jury's deliberation of her guilt on those unrelated counts of health care fraud. If any element of these separate offenses relied, even marginally, on the Clinique's practice of pre-signing prescriptions, the Court might recognize some possibility of prejudice here. But the Court carefully instructed the jury about the elements necessary to convict her on each of these offenses, and none bore any relation to the facts implicated by the prosecutor's misstatement.[25] [R. 272 at 41-52.]

Mrs. Chaney also fails to mention that the jury actually *acquitted* her of 88 out of 101 counts of health care fraud. [R. 283 at 1.] She makes no attempt to explain how, if the prosecutor's misstatement generally compelled the jury to reject her "good faith" defense by "inferr[ing] that her involvement in the many varieties of health care fraud was not so benign and exculpatory as it otherwise appeared," they nevertheless acquitted her of almost ninety percent of those counts. This split verdict strongly indicates that the jury followed the Court's instructions and carefully weighed

---

[25] Because the prosecutor's misstatement did not impact any of these substantive health care fraud offenses, it also did not implicate Count 68, which charges the Chaneys with conspiring to commit health care fraud. [R. 272 at 41.] The Court expressly instructed the jury that "[i]n order to return a guilty verdict [on Count 68], all twelve of you must agree that" the defendants conspired to commit at least one of the substantive health care fraud counts. [R. 272 at 77.]

the specific evidence relevant to each offense. *Cf. Bradley*, 644 F.3d at 1279-80 (holding that evidence a jury "partially acquitted" the defendant suggests "that the jury did indeed 'consider[ ] the charges individually and assess[ ] the strength of the evidence as to each charge.'") (citation omitted); *see also* Jury Instructions, R. 272 at 13 ("It is your duty to separately consider the evidence that relates to each charge, and to return a separate verdict for each one."); *Starnes*, 552 F. App'x at 523-24 ("[W]hen a court instructs a jury to do something, there is a strong presumption that the jury will follow that instruction."). There is no tenable basis for suspecting that the prosecutor's misstatement prejudiced Mrs. Chaney's defense as to these unrelated counts.[26]

The real counts at issue are the "drug and drug related charges." [R. 297-1 at 2.] The Clinique's habit of pre-signing prescriptions is relevant to each of these counts, and thus a more probing analysis of the misstatement's effect on these charges is in order. The first is Count 1, which alleges that Mrs. Chaney conspired "to unlawfully distribute and unlawfully dispense Schedule II controlled substances and Schedule III controlled substances."[27] [R. 190 at 11.] Because Hoskins's phantom testimony implicated Mrs. Chaney in the pre-signed prescription scheme, the Court finds that the prosecutor's misstatement did "tend to mislead" the jury about the evidence supporting Count 1. This is especially true given that the statement occurred during the Government's closing argument. *See Simpson v. Warren*, 475 F. App'x 51, 63 (6th Cir. 2012)

---

[26] Because Mrs. Chaney has failed to show that the prosecutor's comment was prejudicial, or even relevant, to these charges, her claim would fail even if the remaining elements of the flagrancy test were met. But the Court also notes that, as described above and below, (1) the prosecutor's statement was isolated and unintentional and (2) the weight of the evidence supporting these counts was substantial. *See supra* at 9-17, *infra* at 43-47.

[27] Counts 63-64, which charge Mrs. Chaney with maintaining a premises that unlawfully distributed or dispensed controlled substances, are derivative of the conspiracy count. Because finding Mrs. Chaney guilty of conspiracy was a sufficient condition for finding her guilty of these two counts, the Court need not discuss them separately here.

(finding it "significant" that prosecutor's misstatements occurred "shortly before deliberations") (citation omitted).

The next question is whether the prosecutor's comment was "isolated or pervasive." *Johnson*, 581 F.3d at 329. This issue is not in serious dispute, as the Defendants readily "acknowledge [that] the Government only misrepresented Mr. Hoskins' testimony one time."[28] [R. 326 at 11.] The parties do, however, strongly disagree about the third element of the "flagrancy" test, which asks if the prosecutor's misstatement was "deliberately made." *Johnson*, 581 F.3d at 329. This conflict turns on the relevant definition of "deliberate."

According to Mrs. Chaney, "[t]he prosecutor's assertion that his 'notes' supported [this misstatement]" suggests that it was a prepared remark, and thus "the misrepresentation was deliberate and intentional." [R. 297-1 at 13.] But this argument presumes that a comment is "deliberate" so long as the prosecutor intended for the challenged words to come out of his mouth. The Sixth Circuit does not interpret the legal standard that way. In deciding whether a comment was sufficiently "deliberate" in this context, courts have consistently looked to the *substantive* intent underlying the prosecutor's comment. In other words, the relevant question is whether the prosecutor intended to mislead the jury or prejudice the defendant, not whether the prosecutor intended to make the statement itself. To hold otherwise would require courts to find that almost every comment by a prosecutor was "deliberate," except in those rare cases where a

---

[28] In her reply, Mrs. Chaney does briefly attempt to argue that "[t]he prosecutorial misconduct in the government's closing argument was not merely an isolated comment" because "the misconduct included a misstatement to the jury regarding Greg Hoskins' testimony, the fabrication of a statement attributed to Mrs. Chaney and then an inexplicable and unfounded representation to the Court that questions eliciting such testimony had been asked of Hoskins." [R. 324 at 1.] That is essentially three ways of saying the same thing. The record shows that the prosecutor made this comment only once in his closing argument. [R. 300 at 18.] He did later comment at the bench that the testimony was in "his notes," but that statement was made to the Court, not the jury. And as explained below, the fact that this testimony appeared in the Government's notes suggests that the misstatement was not made in bad faith.

41

prosecutor's statement actually resulted from a slip of the tongue.  That is not the standard.  *See,*
*e.g., Johnson*, 581 F.3d at 330 ("Although the questions were deliberately *placed* before the jury,
they were not the kind of repeated errors that we have deemed 'deliberate misconduct' in the
past.") (emphasis added); *United States v. Solivan*, 937 F.2d 1146, 1154 (6th Cir. 1991)
(distinguishing its own facts from those where comments were not "deliberately injected into the
proceedings to incite the jury against the defendant."); *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir.
2005) (holding that "[t]he intentionality of the prosecutor's improper remarks can be inferred
from their strategic use," and noting that the prosecutor "opted to select inappropriate arguments
and use them repeatedly during summation."); *United States v. McConer*, 530 F.3d 484, 500 (6th
Cir. 2008) (finding prosecutor's statement was not deliberate because it could not "be said that
the prosecution was deliberately attempting to sneak in prohibited evidence.").  Here, the fact
that the prosecutor believed Hoskins's statement was in evidence—and even affirmed that this
testimony was "[in] his notes"—strongly suggests that he did not intend to mislead the jury.

The Government also notes that, "[a]s the Defendants' conceded, Greg Hoskins's
statement to the FBI clearly indicated Mrs. Chaney pre-signed prescriptions." [R. 311 at 8.]  And
in the witness list submitted to the Court before trial, the Government stated that Hoskins would
provide this precise testimony.  *See* Government Witness List at 10.  The prosecutor's
misstatement likely resulted from (1) an inadvertent failure to elicit this testimony at trial and (2)
a secondary failure to recognize this oversight prior to closing arguments.  No evidence indicates

that the Government actually intended to "sneak in prohibited evidence." *McConer*, 530 F.3d at 500.[29]

The fourth and final element requires the Court to measure the strength of "the overall evidence against the defendant." *Johnson*, 581 F.3d at 329. This is the most important question. In their post-verdict motions, the Chaneys apparently assume that Count 1 resulted strictly from the Clinique's practice of pre-signing prescriptions. But as the Court noted in its previous Rule 29 order, "Count 1 is not limited to pre-signed prescriptions." [R. 267 at 2.] The jury instructions explain that Count 1 simply charges Mrs. Chaney "with conspiring to knowingly and intentionally distribute and/or dispense" controlled substances "outside the usual course of professional practice and without a legitimate medical purpose." [R. 272 at 17.] With that broad allegation in mind, the Court will now detail the evidence relevant to Count 1.

In his trial testimony, Dr. Chaney confirmed that Mrs. Chaney served as the central manager of the Clinique's operations. He testified that she was the CEO, that she "set the schedule," that she supervised the facility's employees, that she was responsible for overseeing the submission of "claims for payment to Medicare, Kentucky Medicaid and private insurers," and that she ordinarily worked at the facility on a daily basis. [R. 319 at 58, 116, 137.] He also admitted that the office's billing and collection instructions sometimes contained the notation "per Lesa" in the margins. [R. 319 at 124, 131, 152.] Larry Patrick, the Clinique's former office

---

[29]  Although Sixth Circuit precedent requires an inquiry into the prosecutor's intent, this questions runs far afield of the ultimate concern, which is whether the Defendants received a fair trial. A "deliberate" statement that does not violate this right will never be grounds for a new trial, while an "accidental" one that does violate this right will often provide these grounds. *See, e.g., United States v. Warshak*, 631 F.3d 266, 307 (6th Cir. 2010) ("[T]he prosecutor's intent in making certain remarks is a fairly rough proxy for the ultimate question, which is whether the remarks at issue contaminated the trial with unfairness."); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

manager, testified that he quit his job because Mrs. Chaney was doing all of his work for him.  [R. 334 at 33.]

Dr. Chaney also indicated that the Clinique's schedule was "locked" by Mrs. Chaney, and only she could determine the number of patients seen in a given time period.  [R. 318 at 68-69.] Numerous staff members reported that Mrs. Chaney would triple- and quadruple-book patients for a single time slot.  Kathleen Caudill, for example, stated that the Clinique's providers would sometimes see four patients in a fifteen-minute period, for a total of twelve patients an hour.  [R. 335 at 10-11.] James Fields testified that "a lot of time[s]" these slots were "quadruple-booked," and visits with providers lasted "very few minutes."  [R. 344 at 19.]  Randall Huff recalled that the Clinique sometimes saw "[a] hundred" patients a day.  [R. 294 at 10.]  Angela Renfro said that patients would wait "[a]nywhere between five to eight hours to be seen," and that she discussed with co-workers her feeling that the Clinique scheduled "too many patients for one day."  [R. 336 at 5.]  Wilder described the frequency and volume of patients as akin to "herding cattle," and stated that providers "got them in there and [ ] got 'em out of there."  [R. 332 at 24.]  And Dr. Chaney reportedly rationalized his own drug use by telling Combs that "if [Mrs. Chaney] expected him to be at the office seeing all the patients" every day at such a high volume, he would need "help to get it done."  [R. 321 at 127.]

Staff members testified that it was impossible to perform their responsibilities at the pace Mrs. Chaney expected.  Combs recalled that Mrs. Chaney would "jump on" nurses if the speed slowed, and "[t]ell them they needed to pick up the pace and keep the flow going."  [R. 321 at 95.] Hoskins stated that Mrs. Chaney would "tell [him] to hurry up and get people in and out," and that "speed[ing] up the exams" was necessary "just to see the amount of patients."  [R. 293 at 49.]  And

Caudill remembered that Mrs. Chaney would ask her "what was wrong with the flow" because the patients were "not getting to the room[s] quick[ly] enough." [R. 335 at 16.] Because the nurses were so often "in a hurry," they began filling out patient charts before the patients had even been seen. [Id. at 15.] Hoskins also stated that providers could not possibly fill out these charts in the time frame permitted, and so typically 20-30 charts would be left in a separate room each day "to be completed later." [R. 293 at 51.]

Providers often failed to fill out these charts on the same day that patients were seen, resulting in "stacks" of medical records being left in this room for days at a time. [Id.] Hoksins testified that Mrs. Chaney would call and ask him to "come in" on weekends to "complete some of the charts." [Id. at 52.] He stated that he would simply "grab a stack of the charts" and fill them in, often for patients that he had not even examined. [Id. at 52-53.] Combs recalled bringing blank charts to the Chaneys' house on the weekends when Mrs. Chaney was present. [R. 321 at 102.] And he even testified that he saw Mrs. Chaney forge Dr. Chaney's signature on the charts and fill them out herself. [R. 323 at 126, R. 321 at 102.]

The evidence also established that Mrs. Chaney actively participated in the pre-signed prescriptions scheme. Larry Patrick testified that Mrs. Chaney repeatedly supplied him with pre-signed prescriptions. [R. 334 at 28.] Combs further testified that Mrs. Chaney would "lock [pre-signed prescriptions] up in a drawer," and that she gave him a "key to the drawer" and told him to retrieve the scripts "any time the providers needed a pre-signed prescription." [R. 321 at 18.] He remembered that there were "just [] stacks" of these pre-signed pads, and that at any given time there might be "100" or more pre-signed scripts in the drawer. [Id. at 19.] He also testified that Dr. Chaney told him "not to tell anybody about" the pre-signed prescriptions, which he assumed

was because "it was not right" to supply the scripts.  [*Id.* at 19-20.]  Combs, the Clinique's "IT guy" who had  a high school education and no medical training, estimated that he personally handed out "hundreds" of pre-signed scripts to unqualified medical providers at Mrs. Chaney's instruction.  [R. 293 at 19, R. 321 at 18, 23.]  At least three other witnesses confirmed that Combs handed out these pre-signed scripts.  [R. 344 at 7, R. 293 at 19, R. 332 at 9-10.]  Fields testified that Mrs. Chaney left the pre-signed scripts for Combs.  [R. 344 at 7.]  And Hoskins, a physician's assistant who was not licensed to prescribe controlled substances, testified that both Combs and Mrs. Chaney gave him pre-signed scripts, even on days when no physician was in the office.  [R. 293 at 19, 71.]

At least eight witnesses also testified that urine drug screens were routinely altered at the Clinique.[30]  [R. 293 at 57-58, R. 294 at 10-15, R. 321 at 27, R. 337 at 9, R 338 at 15, R. 339 at 10, R. 340 at 7-8, R. 344 at 11.]  Combs testified that Mrs. Chaney's office lay only "10-15 feet" from the lab where these alterations occurred.  [R. 321 at 23.]  After Fields witnessed a staff member alter a urine drug screen, he took the test to Mrs. Chaney and told her it had been altered.  [R. 344 at 12.]  And Wanda Couch stated that she showed an altered drug screen to Mrs. Chaney in order "to tell her . . . about the drug test[s] being changed."  [R. 340 at 21.]  She nevertheless confirmed

---

[30]  Mrs. Chaney argues that her culpability "with respect to altered urine drug screens . . . has no connection to any charge actually made in the case."  [R. 350 at 4.]  This claim ignores the fact that Count 1 broadly charges Mrs. Chaney with conspiring to unlawfully dispense and distribute controlled substances.  [R. 272 at 17.]  Evidence that urine drug screens were routinely altered to conceal patients' drug abuse and/or diversion—and that Mrs. Chaney was repeatedly notified of this practice—is plainly relevant to the conspiracy charge.

that after showing Mrs. Chaney the altered test, nothing changed and the "urine drug screens continue[d] to be altered."[31]  [*Id.*]

In total, these facts supplied overwhelming evidence of Mrs. Chaney's active participation in a conspiracy "to knowingly and intentionally distribute and/or dispense" controlled substances "outside the usual course of professional practice and without a legitimate medical purpose."  [R. 272 at 17.]  Although the prosecutor's misstatement did "tend to mislead the jury" about one piece of the Government's narrative, the remainder of this evidence powerfully counterbalanced any prejudice caused by the prosecutor's isolated, unintentional misstatement.  This comment was not sufficiently flagrant to warrant reversal on Count 1.[32]

The final category of charges against Mrs. Chaney poses the hardest question.  Counts 198-220 accuse her of participating in a scheme to conceal "a material fact" by billing insurance providers for pre-signed prescriptions.  [R. 272 at 51, R. 190 at 33-34.]  The "material fact" here is that the prescriptions were pre-signed.  Dr. Youlio, an employee of the company that administers Medicare's Part D prescription drug benefits, testified that Medicare and Medicaid will not pay for pre-signed prescriptions because they are "not [issued] for a medically accepted purpose."  [TR: Youlio Direct Examination at 7.]  But in order to find Mrs. Chaney guilty of these counts, the Government also had to prove that she "knowingly and willfully" concealed the fact that the prescriptions were pre-signed, meaning she "acted with knowledge that [her] conduct was

_____

[31]  The Government also provided substantial evidence of Mrs. Chaney's motive for supporting this unlawful conduct.  The prosecution argued that "Mrs. Chaney, more than anyone, spent the fraudulently obtained money and enjoyed the fruits of the Defendants' fraud."  [R. 346 at 8.]  These expenses included a startling amount of foreign travel on the Chaneys' private plane—often on days when prescriptions bearing Dr. Chaney's name were issued—and tens of thousands of dollars consistently spent on clothing and other items.  [*Id.*]  Although these luxuries, standing alone, furnished no evidence of Mrs. Chaney's guilt, they supplied persuasive context for the evidence presented.

[32]  Because the evidence supporting Count 1 (and, by extension, Counts 63-64) was overwhelming, any claim premised on non-flagrant conduct would fail as to these counts.  *See supra* at 49.

unlawful." [R. 272 at 52.]; *see also* Brief of the United States, *Russell v. United States,* 2014 WL 1571932, at * 6 (March 10, 2014); *Russell v. United States,* 134 S. Ct. 1872 (2014).

The question presented to the jury on these counts, then, was fairly narrow. The jury needed to conclude that Mrs. Chaney (1) aided in concealing the fact that Dr. Chaney pre-signed prescriptions and (2) did so "with knowledge that [her] conduct was unlawful." [*Id.*] These counts thus directed the jury to the specific question of whether Mrs. Chaney knew that, according to Medicare and Medicaid, pre-signed prescriptions could not be issued "for a medically accepted purpose." [TR: Youlio Direct Examination at 7.] The prosecutor's misstatement did touch, at least indirectly, upon this question. Mrs. Chaney's alleged conduct—in which she forged Dr. Chaney's signature and added, "You didn't see this" [R. 300 at 18]—strongly implied that (1) she cared little about the legitimacy of these prescriptions and (2) she knew her approach to handling these prescriptions, if known to others outside the facility, would place her in legal jeopardy. And that impression of recklessness and bad faith could have influenced the jury's perception of her broader knowledge about the legitimacy of the pre-signed scripts.

Because the question before the jury was narrow, the universe of evidence relevant to these counts was also somewhat circumscribed. This evidence included a broad range of testimony establishing that Mrs. Chaney directly facilitated Dr. Chaney's practice of pre-signing prescriptions. *See supra* at 45-46. Other evidence also demonstrated (1) her intimate familial and working relationship with Dr. Chaney, whose medical training would have alerted him to the danger and illegitimacy of these prescriptions, (2) her central role in running the Clinique, including her supervision of the billing process, and (3) her deep understanding of the way the Clinique operated, including the strong likelihood that patients were routinely seeking

prescriptions for illegitimate purposes. *See supra* at 43-47. Faced with this evidence, the jury was entitled to infer that Mrs. Chaney concealed the Clinique's practice of pre-signing prescriptions with knowledge that her conduct was unlawful. Given (1) the substantial weight of this evidence and (2) the fact that the prosecutor's comment was isolated and unintentional, the Court finds again that the Government's misstatement was not flagrant.

But that is still not the end of the inquiry. Even non-flagrant conduct may warrant a new trial "if (1) proof of defendant's guilt is not overwhelming, *and* (2) defense counsel objected, *and* (3) the trial court failed to cure the error with an admonishment to the jury." *Carroll,* 26 F.3d at 1385–86.[33] As explained above, counsel for the Chaneys immediately objected to the Government's misstatement, and the Court lacked the information necessary at the time to issue a proper curative instruction.

The remaining question is whether the evidence against Mrs. Chaney on these counts was overwhelming. Taking all of the cited testimony into careful consideration, *supra* at 45-46, the Court finds that the evidence of Mrs. Chaney's *involvement* in the provision of pre-signed prescriptions was overwhelming. But the Court cannot similarly say that the evidence of her specific *knowledge* about the illegitimacy of these pre-signed scripts was also overwhelming. Although the Government provided significant evidence to support this element of the offense, the present question is not whether this evidence was significant, but whether it was "overwhelming."

---

[33] The Court need not apply the standard for non-flagrant conduct to Mrs. Chaney's separate health care fraud counts. Mrs. Chaney has altogether failed to show that the prosecutor's misstatement even touched upon these counts, much less that it caused any prejudice to her defense against those charges. The Court would not be required to apply this standard if, for example, (1) the prosecutor stated that Hoskins had testified about her unpaid parking tickets, (2) the defense objected, and (3) the Court failed to issue a curative instruction. Although the test for non-flagrant conduct does not explicitly incorporate the requirements of relevance and prejudice, common sense holds that a defendant must first demonstrate these threshold elements before the test can apply. And in any case, the evidence supporting these counts was overwhelming.

*Carroll,* 26 F.3d at 1385–86.  It was not.  Mrs. Chaney is entitled to a new trial on Counts 198-220.[34]

## D

Lastly, Dr. Chaney argues that "[e]ven if the Court does not believe any individual argument herein requires a new trial, taken together, and considering also Defendants' arguments set forth in their motion for judgment of acquittal, justice requires that Defendants be afforded a new trial."  [R. 299-1 at 9.]  Under Fed. R. Crim. P. 33(a), the Court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Resort to this rule typically requires some finding that "the [jury's] verdict was against the manifest weight of the evidence" or a "substantial legal error has occurred."  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

The Government introduced a wealth of evidence establishing the Chaneys' direct and pervasive involvement in these crimes.  *Cf. Lundy v. Campbell*, 888 F.2d 467, 481 (6th Cir. 1989) ("The asserted grounds for relief, considered individually or together, describe 'mistakes' . . . that pale into relative insignificance given the overwhelming uncontradicted evidence of the defendant's guilt.").  And apart from the prosecutorial misconduct issue noted above, no

---

[34] Vacating these counts will not impact the validity of Mrs. Chaney's separate conspiracy and money laundering convictions.  Count 1 does not necessarily rely upon—or even mention—the pre-signed prescriptions scheme.  And Count 68 charges Mrs. Chaney with conspiring to commit "health care fraud." [R. 272 at 41.]  Counts 198-220 do not charge Mrs. Chaney with committing health care fraud, but with providing a false statement under 18 U.S.C. § 1035.  [*Id.* at 51.]  The Court expressly instructed the jury that "[i]n order to return a guilty verdict [on Count 68], all twelve of you must agree that" the defendants conspired to commit at least one of the underlying health care fraud counts, which did not include Counts 198-220.  [R. 272 at 77.]  Courts "must presume that juries follow their instructions" absent an "overwhelming probability that the jury [was] unable to follow [them]."  *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000) (internal quotations and citation omitted).  Vacating these counts also will not impact Mrs. Chaney's separate money laundering charges unless those charges explicitly "cross-referenc[ed]" the "counts that ha[ve] been vacated."  *United States v. Tencer*, 107 F.3d 1120, 1130 (5th Cir. 1997); *see also United States v. Jamieson*, 427 F.3d 394, 403 (6th Cir. 2005) (citing *Tencer* with approval and noting "[a] review of the record indicates that the money-laundering counts do not rely solely on the [disputed counts] as their predicate.").  These money laundering counts broadly refer to drug distribution and health care fraud, and make no mention of Counts 198-220.  [R. 272 at 32, 54.]

"substantial legal error occurred" that might otherwise warrant a new trial. *Cf. United States v. Anderson,* 488 F. App'x 72, 80 (6th Cir. 2012) ("[C]umulative error analysis only applies to errors, not non-errors."). Nor can the Court identify any other legal or equitable basis for granting a new trial. The Court will thus deny Dr. Chaney's motion on these grounds.

### III

With the exception of Mrs. Chaney's challenge to Counts 198-220, the Chaneys' claims are meritless. Accordingly, the Court **HEREBY ORDERS** as follows:

(1) Dr. James Alvin Chaney's and Ace Clinique of Medicine's Motion for New Trial and Motion for Acquittal **[R. 298, 299]** are **DENIED**;

(2) Lesa L. Chaney's Motion for Acquittal **[R. 296]** is **DENIED**;

(3) Lesa L. Chaney's Motion for New Trial as to Counts 198-220 **[R. 297]** is **GRANTED**;

(4) Lesa L. Chaney's Motion for New Trial as to all other counts **[R. 297]** is **DENIED.**

This 30th day of September, 2016.



Gregory F. Van Tatenhove
United States District Judge